FILED
2024 Sep-17  PM 04:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | |
|---|---|
| **PAMELA SMOTHERS,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  6:21-CV-01057-RDP** |
| } | |
| **ROGER CHILDERS, et al.,** } | |
| } | |
| **Defendants.** } | |
| } | |

### <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant Walker County, Alabama's ("Walker County") Motion for Summary Judgment. (Doc. # 69). The parties have fully briefed the motion. (Docs. # 77, 82, 83). For the reasons explained below, Walker County's Motion for Summary Judgment is due to be granted.

### I.    Background and Procedural History

Plaintiff, as the administrator and personal representative of Mitchell Wayne Smothers Junior's ("Mr. Smothers") estate,[1] brings this action seeking damages for Mr. Smothers's death. (Doc. # 3). Plaintiff alleges that Mr. Smothers died because of inadequate medical care while he was housed in the Walker County Jail. (*Id.* at 3-5, 29-31). Plaintiff named Roger Childers, Preemptive Forensic Health Solutions ("PFHS"), and Walker County as defendants in addition to fictitious parties. (*Id.*).

On June 4, 2024, the court dismissed the case without prejudice as to Defendants Roger Childers and PFHS, after having been informed that settlements had been reached between

---

[1] Plaintiff is also Mr. Smothers's mother.

Plaintiff and those parties. (Doc. # 85). The court's partial dismissal order was modified on June 11, 2024, when this court ordered that these claims be dismissed with prejudice (Doc. # 90) in accordance with the Stipulations of Dismissal between Plaintiff and Roger Childers (Doc. # 88) and between Plaintiff and PFHS (Doc. # 89). Walker County is the only remaining Defendant named in Plaintiff's First Amended Complaint.

The only cause of action that Plaintiff brings against Walker County is a § 1983 failure to fund claim. (Doc. # 3 at 29-31). Plaintiff alleges that "Walker County has a duty to pay for medical care provided to inmates." (*Id.* at ¶ 122). Plaintiff also claims that Walker County was deliberately indifferent in continuing a contractual relationship with PFHS because it knew PFHS could not provide (or did not provide) the necessary medical care and that PFHS was only selected because it was the lowest-cost medical provider. (*Id.* at ¶¶ 39, 123-28). Walker County's Motion for Summary Judgment (Doc. # 69) argues that although it has a statutory duty to pay for necessary inmate medical care, it does not have a duty to manage medical care by removing a provider once put on notice that the medical care was low quality. (Doc. # 77 at 1-2). Walker County further argues that it met this duty by engaging with PFHS in a contract to provide "basic and adequate" medical services and by allocating 60% of the County budget to the Sheriff's Office – 8% of which paid for inmate medical care. (Doc. # 77 at 1-2).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis

for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson* 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Factual Background

The court has gleaned the facts set out in this opinion from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

In 2009, the Walker County Commission entered into a Contract for Services (hereinafter referred to as "CFS")[2] with Alabama-based third-party medical provider PFHS for the provision of comprehensive onsite medical services for inmates in the Walker County Jail in exchange for $168,000 annually in payments of $14,000 per month. (Doc. # 70-5 at 5). Walker County Administrator Robbie Dickerson testified that PFHS was one of the lowest-cost providers that submitted bids to Walker County to provide medical care for the Walker County Jail. (Doc. # 70-1 at 30). The 2009 CFS indicated that PFHS would "provide basic medical care, treatment(s) and services(s) [sic] to the 'County' inmates of the 'County Jail' seven (7) days per week." (Doc. # 70-5 at 2). The CFS further provided that "Physicians will come [to] the jail for formal clinic one (1) day per week," and that PFHS "will have a physician on call and available to the nurses and jail staff for special situations seven (7) days per week, twenty-four (24) hours per day." (*Id.* at 3). Additionally, the CFS provides that PFHS "will have a nurse available at the jail seven (7) days per week during defined hours" and that the "nurse will administer medication" and schedule necessary appointments for County inmates (including "appointment(s) with specialists"). (*Id.*). These appointments included for "[d]ental, orthopedics, ophthalmologist, MRI, X-rays, lab work or other medical treatment(s) or need(s) requiring appointment(s) with specialists" as ordered by the jail physician. (*Id.*).

Relevant to cost and payment, the CFS specified certain services to be provided by PFHS "so as to minimize the cost incurred to Walker County from the use of other medical facilities." (*Id.* at 4). These services include "[c]leansing and dressing of wounds," as well as "[o]rdering and stocking any necessary medication(s)." (*Id.*). And, the CFS committed the County to "be

---

[2] The County and PFHS entered into three separate contracts (or CFS), each containing substantially the same terms. This statement of facts cites to the third CFS for contract specifics because that third CFS was the operative contract at the time giving rise to this lawsuit.

responsible for the payment of all reasonable and necessary medical expenses." (*Id.*). Last, the CFS provided that "[i]f, in the opinion of the 'County', the 'Provider' is not in compliance with the terms and obligations set forth above . . . then the County" may give "60 days' notice to correct any alleged deficiency." (*Id.* at 6).

In 2012, the County renewed the CFS with PFHS for similar services as those specified in the 2009 CFS in exchange for $181,440 in payments of $15,120 per month. (Doc. # 70-6 at 5). Differences between the 2009 and 2012 CFS include that the 2012 CFS only required a "medical team including a Physician, dentist or advanced practice nurse" rather than specifically "[p]hysicians" to "come to the jail for formal clinic one (1) day per week." (*Id.* at 3). Similarly, while the 2009 CFS required PFHS to have a "[p]hysician" on call and available to staff nurses, the 2012 CFS required "a physician, dentist *or* advanced practice nurse" to be on call. (*Id.*) (emphasis added). Additionally, while the 2009 CFS only required one nurse to administer medication and make necessary appointments for inmates at the jail seven (7) days per week, the 2012 CFS required "two nurses" to do so. (*Id.*).

The President and Owner of PFHS is "Dr."[3] Roger Childers, a registered nurse licensed to practice nursing in the state of Alabama. (Doc. # 72-1 at 6-7). On September 2, 2015, Childers wrote to the Walker County Commission a letter touting the care and savings that he provided, stating that he had cut costs on the pharmaceutical budget, transferred fewer inmates out of jail for medical visits because of the medical care provided by PFHS (including the provision of all dental care for inmates inhouse at the jail, the provision of two licensed RN's or LPN's every morning

---

[3] As the 2016 CFS explained, Roger Childers held a Ph.D., but was not a medical doctor, so he was not allowed to "sign any medical treatment forms prepared for the County as 'Dr. Childers' in order to avoid any confusion with his educational credentials." (Docs. # 70-9 at 7; # 70-1 at 26). Sheriff Smith testified that Childers repeatedly referred to himself in emails as "Dr. Childers," and that this "supported things that we had been hearing about him not being an actual doctor." (Doc. # 70-2 at 56).

and two licensed RN's or LPNs every evening 365 days a year) and converted all inmate medical records to be stored electronically.  (Doc. # 70-7 at 2-3).

On July 24, 2016, in response to a question from the Commission regarding who was the physician that PFHS used and the frequency that the physician came to the jail, Childers sent an email to the Commission stating that Dr. Ajmal Kahn came to the jail monthly "as does the dentist and or [sic] an advanced practice nurse." (Doc. # 70-8 at 2). The CFS in place at the time of this email required a "medical team including a Physician, dentist or advanced practice nurse" to "come to the jail for formal clinic one (1) *day per week*" (Doc. # 70-6 at 3) (emphasis added), rather than just one day per month. (*See* Doc. # 70-8 at 2).

On September 6, 2016, the County renewed the CFS with PFHS for the same onsite services in exchange for $208,464 annually in payments of $17,372 per month. (Doc. # 70-9 at 6). The term of the 2016 CFS ran from October 1, 2016, to September 30, 2018, (*Id.* at 8), and after the original term expired, the contract was continued month-to-month. (Doc. # 70-1 at 33). The 2016 CFS differed from the 2009 and 2012 CFS by requiring PFHS to provide "basic *and adequate* medical care, treatment(s) and service(s) to the County inmates." (Doc. # 70-9, at 3). The CFS added that the "medical team" provided for in the 2012 CFS must be "properly licensed and credentialed." (*Id.*). And, while the 2009 and 2012 CFS used the language "[i]f, in the opinion of the County" before describing the procedure for notice and curing of any deficiency under the contract, the 2016 CFS used the language "[i]f, in the sole discretion of the County." (*Id.* at 8).

In 2017, the County was facing possible bankruptcy. (Doc. # 70-1 at 30). Expenditure cuts were made in fuel, utilities, cell phones, and insurance costs. (*Id.*). Despite these cuts, the proportion of the general fund budget allocated to the Sheriff's Office increased from 45% in the fiscal year 2008-2009 to 51% in the fiscal year 2017-2018 and 60% in 2018-2019. (Doc. # 70-10

at 2). This resulted in only a small decrease in the jail's budget. While Sheriff Smith was budgeted $5,806,457.56 in 2016-2017, he received $5,036,986.78 in 2017-2018 and the amount went back up to $5,935,889.64 in 2018-2019. (Doc. # 70-10 at 3).

Walker County Administrator Robbie Dickerson testified she was aware, based on legal documentation, that after PFHS's contract began, several inmates had died and that there were complaints that these deaths were due to a lack of medical care. (Doc. # 70-1 at 27) (confirming familiarity with at least the names of deceased Walker County Jail inmates Nelson Tidwell, Terry Benton, Autumn Harris, and Anthony Hunt). When campaigning for sheriff in 2018, one of Sheriff Nick Smith's campaign issues was the low quality of medical care provided at the Walker County Jail. (Doc. # 70-2 at 46).

Once elected Sheriff in January 2019, Sheriff Smith did not have the authority to cancel the contract with Childers or PFHS. (Docs. # 70-2 at 47-48; # 70-1 at 33; # 70-3 at 19). Sheriff Smith did, however, have the responsibility to ensure the CFS with PFHS was being complied with. (Doc. # 70-1 at 34). While administering the CFS, Sheriff Smith voiced concerns to Walker County that PFHS was providing only CNAs (nurse assistants) rather than nurses, as required by the CFS. (*Id.* at 27, 34).[4] Additionally, according to the testimony of Walker County Jail Correctional Officer Jottie Tidwell, Sheriff Smith made it "abundantly clear" that he was concerned that PFHS was not providing proper medical treatment to inmates. (Doc. # 70-3 at 24-25; *see also id.* at 19).

Before Mr. Smothers's death, another inmate, Mindy Tidwell, died due to purported inadequate health care at the jail. (Doc. # 70-2 at 47-49). Sheriff Smith discussed with County Commissioner Chairman Jerry Bishop his concerns about the low quality of medical care being

---

[4] Robbie Dickerson noted that Sheriff Smith did not give an example of what he thought was substandard care given by the CNA. (Doc. # 70-1 at 35).

provided by Childers and PFHS, and specifically the concern that Childers was not following the CFS. (*Id.*). Sheriff Smith testified that Mr. Bishop indicated that because "it was his election cycle . . . we would address the contract and the bid after the election." (*Id.* at 57). Around July 2019, Sheriff Smith also instructed his correctional officers at the Walker County Jail that "if someone complained about their toe being stubbed, send them to the hospital." (Docs. # 70-2 at 18, 23-24; # 70-3 at 25). Additionally, Sheriff Smith directed Childers to "email me every day what problems we had inside the facility as far as inmates that were vulnerable" (Doc. # 70-2 at 48), which Childers began doing. (*Id.* at 53). The medical expenses for inmates' health care roughly doubled after this policy was implemented. (*Id.* at 50).

According to Sheriff Smith, the County Commission never refused to pay a bill for outside medical care for inmates. (*Id.* at 59). The Commission, specifically Robbie Dickerson, did question why the jail's outside medical billing was increasing, but the County Commission never directed Sheriff Smith to end this policy. (*Id.* at 48, 59). Walker County also never took money out of other areas of Sheriff Smith's budget due to this policy change. (*See id.* at 59). Additionally, when Sheriff Smith asked Walker County to increase the daily time allocated for jail medical care from eight-hour days to sixteen-hour days, they agreed and paid for that increase. (*Id.* at 60).

Mr. Smothers, the Plaintiff's decedent, was an Alabama Department of Corrections inmate held at the Walker County Jail from February 12, 2019 through August 6, 2019 for failure to report to his Probation Officer. (Docs. # 3 ¶ 93; # 81-1 at 4-6). Mr. Smothers's medical conditions included liver cirrhosis secondary to hepatitis C and alcoholism, COPD, chronic venous insufficiency, recurrent cellulitis, and the formation of non-healing pressure wounds. (Docs. # 3 ¶ 3; # 81-8 at 3-5; # 81-2 at 57). Mr. Smothers was in significant pain after his arrest, and often told his mother, Plaintiff, about this pain. (Doc. # 70-4 at 34). Mr. Smothers later told Plaintiff that "the

only thing that they would give him was ibuprofen," even though he had been on antibiotics, a water pill, antacids, and stomach medicine at the time of his arrest. (*Id.* at 36).[5] Mr. Smothers told Plaintiff that he did not complain about his health issues to anyone at the jail and did not request medication that was not received. (Doc. # 70-4 at 37-39).[6] Plaintiff also never visited or called the Sheriff or the jail to tell them that Mr. Smothers needed medical treatment. (*Id.* at 37).

By May or June 2019, Mr. Smothers told Plaintiff that "he was passing pure blood and he could not stand on his own" (*Id.* at 38), and that he was having "[t]remendous stomach pain." (*Id.* at 39). At some point, Mr. Smothers had also told Plaintiff that he was experiencing "[o]pen lesions on his legs running blood and fluid." (*Id.* at 42). On June 24, 2019, Jottie Tidwell wrote a letter to the Alabama Department of Corrections indicating that they needed Mr. Smothers "transferred to the Department of Corrections ASAP" due to "the high medical risks for us at the Walker County Jail." (Doc. # 70-13 at 2).

Mr. Smothers was hospitalized at Walker Baptist Hospital on August 2, 2019. (Doc. # 70-16 at 31, 40). On August 3, 2019, Childers emailed Sheriff Smith about Mr. Smothers's "cellulitis," which Sheriff Smith testified was the first time he had "heard anything about Smothers." (Doc. # 70-2 at 53, 112). On August 6, 2019, Mr. Smothers was transferred to the Alabama Department of Corrections at Kilby Prison. (Docs. # 3 ¶ 93; # 70-4 at 53; # 70-15 at 39; # 70-2 at 37). After being sent to Kilby Prison, Mr. Smothers was deemed "nonresponsive" and was hospitalized at Jackson Hospital in Montgomery, where he died from septic shock on August 12, 2019. (Docs. # 3 ¶¶ 90-96; # 70-15 at 1; # 70-4 at 53; # 70-16 at 40, 132, 146).

---

[5] Plaintiff also testified that Mr. Smothers was scheduled to begin shots for his liver issues the morning after he was arrested. (Doc. # 70-4 at 54). When Mr. Smothers was arrested, Plaintiff told the arresting officers about Mr. Smothers's appointment for the liver shots, but she did not offer any medical documentation to confirm this. (Doc. # 70-4 at 55, 58).

[6] Mr. Smothers did, however, tell Plaintiff that "one time" his fellow inmates had told jailers that Mr. Smothers needed attention, and "nobody ever showed up." (Doc. # 70-4 at 40).

## IV.    Analysis

Plaintiff brings a single cause of action against Walker County under § 1983, alleging a failure to fund medical care. (Doc. # 29-31). Section 1983 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party . . . ." 42 U.S.C. § 1983. Here, Plaintiff alleges that Mr. Smothers was deprived of his right under the Eighth (and Fourteenth) Amendments to be free from cruel and unusual punishment. (Doc. # 3 ¶ 128).

In a § 1983 action against a county, a plaintiff bears the burden of demonstrating "that the constitutional violation occurred as a result of a county policy." *Cagle v. Sutherland*, 334 F.3d 980, 986 (11th Cir. 2003). In addition, a plaintiff must show that the county had the "requisite degree of culpability" and that there is a "direct causal link" between the county's action and the deprivation. *Id.* "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997). Last, and most importantly, Alabama law does not impose on Walker County a duty to assure that procedures are in place for inmates to receive appropriate medical care. *See Williams v. Limestone Cnty., Ala.*, 198 Fed App'x 893, 895 n.2 (11th Cir. 2006) (citing *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1026 n.6 (11th Cir. 2001)). "Rather, Alabama law assigns counties a 'limited role in building and funding the jails.'" *Id.* (quoting *Turquitt v. Jefferson Cnty., Ala.*, 137 F.3d 1285, 1289-91 (11th Cir. 1998)).

## A.    Result of County Policy

A plaintiff may establish a municipality's policy in two ways: "(1) an officially promulgated [] policy or (2) an unofficial custom or practice . . . shown through the repeated acts of a final policymaker for the [municipality]." *Walker v. City of Calhoun, Ga.*, 901 F.3d 1245, 1255 (11th Cir. 2018) (quoting *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003)).

Initially, the court notes that the Walker County Sheriff was not a final policymaker for Walker County. A county does not establish a policy through an official merely because that official has discretion in the exercise of their functions. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986). Further, the Alabama Supreme Court has held that the sheriff's authority, which is "over the jail," is "totally independent" of a county's authority. *King v. Colbert Cnty.*, 620 So.2d 623, 625 (Ala. 1993). A county pays the salaries of the sheriff and jail personnel, Ala. Code §§ 11-12-15(a)(2), 36-22-16, but this "does not translate into control over him," and "at most" gives a county an "attenuated and indirect influence over the sheriff's operations." *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 792 (1997). Thus, the Sheriff of the Walker County Jail did not have the authority to make policy on behalf of Walker County.

Plaintiff argues that Walker County's policy was to continue to contract with PFHS "to save money," and in doing so it acted in "deliberate indifference to Smothers constitutional rights." (Doc. # 82 at 18). Plaintiff also argues that this policy was embodied in the CFS with PFHS, which directed PFHS to "perform wound care services" and "pay for doctor's visits at the jail" in order to "further minimize its cost" (*Id.*). Further, Plaintiff emphasizes, "to the exclusion of the Sheriff . . . only the County could cancel the contract [with PFHS]." (Doc. # 82 at 18-19). Plaintiff then points out that although Sheriff Smith made Walker County aware of the fact that PFHS was not in compliance with its CFS – by only having doctors come to the Walker County Jail once a month

instead of once a week, and by staffing the jail with nurses' assistants – Walker County did not solicit bids for a different provider until 2021. (*Id.* at 19). Finally, Plaintiff alleges that once Sheriff Smith implemented his policy of sending inmates needing medical attention directly to the hospital, thus increasing the cost of inmate medical care, Walker County discouraged this policy by threatening to cut other items in Sheriff Smith's budget. (*Id.* at 20).

Defendant argues that Walker County's policy was embodied in its "contractual arrangement for inmate medical services" with PFHS, which included paying "$472,506.92 for inmate medical care." (Docs. # 77 at 12; # 70-10 at 3). Defendant also highlights that "Walker County has consistently funded medical care at the jail even during financially challenging periods such as facing bankruptcy," and notes that without dispute, Walker County has never refused to pay a bill for outside medical care for inmates. (Doc. # 77 at 13).

The parties do not dispute that at least part of Walker County's policy was embodied in the CFS with PFHS. The contract that was in place in 2019, when Mr. Smothers resided in Walker County Jail, was the 2016 CFS. This CFS required PFHS to provide "basic *and adequate* medical care, treatment(s) and service(s) to the County inmates," a "properly licensed and credentialed medical team including a physician, dentist or advanced practice nurse" to come to the jail once a week, a "physician dentist, or advanced practice nurse on call" 24/7, and "two nurses on site" seven days a week. (*See* Doc. # 70-9 at 3) (emphasis added). Although Walker County was made aware of PFHS's non-compliance with the CFHS, Sheriff Smith was the actor responsible for ensuring compliance with the contract. Nevertheless, it was part of Walker County's policy to continue to contract with PFHS after being made aware of this non-compliance, as it chose to continue the CFS on a month-to-month basis during that timeframe.

There is a question as to whether part of Walker County's policy was to save money in deliberate indifference to providing adequate inmate medical care. There is no evidence that Walker County's explicit policy was to save money at the cost of adequate inmate medical care. True, PFHS was one of the lowest bids for providing inmate health care, and the County's threat of bankruptcy in 2017 would undoubtedly have raised the issue of cost savings to the County. (Doc. # 70-1 at 30). But the County's choice of a low-cost provider in the light of looming bankruptcy at most establishes that cost was a major factor in their choice of medical care providers. Defendant has presented undisputed evidence that the CFS entered into with PFHS required a certain minimal amount of medical care for inmates.

Further, beyond pointing to the fact that PFHS was one of the lowest cost bidders to provide medical care, Plaintiff has not presented any Rule 56 evidence to show that Walker County's policy was to prioritize cost savings over selecting an adequate inmate medical care provider. Evidence of PFHS's focus on cost savings includes a provision in the 2019 CFS that directed PFHS to handle certain services, such as wound dressing or ordering medications, in house. (Doc. # 70-5 at 4). Additionally, in 2015, Childers sent an email to Walker County touting his cost savings – such as cutting pharmaceutical costs, transferring fewer inmates out of jail for medical care, conducting dental care in house, and converting medical records to an electronic format. (Doc. # 70-7 at 2-3). At the same time, though, once Sheriff Smith began his policy of sending inmates to the hospital if they needed medical attention, Walker County did not make any cuts to his budget, nor did they direct him to end the policy – although the county did inquire why medical costs had increased. (Doc. # 70-2 at 48, 59). That Walker County noticed and inquired about rising costs is unsurprising. But, Walker County never refused to pay any outside medical bill. (*Id.* at 59). Further, even though Walker County was facing bankruptcy in 2017, they did not make significant cuts to the Sheriff's

budget, which is the source of funding for inmate medical care. In fact, over time, Walker County has increased the proportion of their general fund budget from 45% in 2008-2009 to 60% in 2018-2019. (Doc. # 70-10 at 2). In sum, Plaintiff's claim that Walker County's policy to contract with PFHS was "to save money" with "deliberate indifference to Smothers constitutional rights" simply is not supported by the summary judgment record. (Doc. # 82 at 18).

Therefore, Plaintiff has not successfully rebutted Walker County's record evidence that at the time of Mr. Smothers's death, Walker County's policy was merely to continue to contract with PFHS through its 2019 CFS.

### B.     Requisite Degree of Culpability

"[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405 (1997). "A plaintiff must show that the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with deliberate indifference to its known or obvious consequences." *Davis v. DeKalb Cnty. School Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000).

Defendant Walker County argues that Plaintiff's failure to fund claim is a veiled-*respondeat-superior* claim that seeks to hold Walker County liable for the failings of Childers and PFHS. (Doc. # 7 at 2). Municipalities and other local government units cannot be held liable under § 1983 on a theory of *respondeat superior*. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). So, any allegations in this case that are directed at Walker County and not relevant to a failure to fund claim are wide of the target.

Plaintiff's Response to Walker County's Motion for Summary Judgment argues that under the Eleventh Circuit case *Ancata v. Prison Health Services, Inc.*, Walker County had a non-delegable duty to provide necessary and adequate medical care and that Walker County remained liable for any unconstitutional deprivations caused by the policies and customs of a medical provider. (Doc. # 82 at 10-11) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985)). Defendant Walker County's Reply to Plaintiff's Response argues that *Ancata* is inapposite because it applied Florida law, which is substantively different than Alabama law. Florida law, Walker County contends, imposes a distinct duty on Florida counties to actually provide medical care, not just to fund it. (Doc. # 83 at 2). The court agrees with Walker County.

Alabama law applies a different standard to Alabama counties than Florida law applies to Florida counties. *See Kister v. Quality Correctional Health Care*, 2018 WL 4794478, at *2 (N.D. Ala. Oct. 3, 2018) (acknowledging that the Florida statute in *Ancata* is materially different from its Alabama corollary). A local government is liable under Section 1983 "only for acts for which the local government is actually responsible." *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1027 (11th Cir. 2001). As the Eleventh Circuit has held, "Alabama counties have no duties with respect to the daily operation of the county jails and no authority to dictate how the jails are run." *Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1291 (11th Cir. 1998). Rather, "[t]he duties of the counties with respect to the jails are limited to funding the operation of the jail and to providing facilities to house the jail." *Id.* at 1289.

As provided by the Code of Alabama, Alabama counties are responsible for funding "[n]ecessary medicine and medical attention to those prisoners who are sick or injured . . . ." Ala. Code 1975 § 14-6-19. This statute places a duty on Alabama counties that is limited to funding medical care for inmates. *See Shaw v. Coosa Cnty. Comm'n*, 330 F. Supp. 2d 1285, 1289 (M.D.

Ala. 2004) (citing *Gaines v. Choctaw Cnty. Comm'n*, 242 F. Supp. 2d 1153, 1161 (S.D. Ala. 2003)); *Cole v. Walker Cnty.*, 2015 WL 1733810 at *4. Under Alabama law, a county "is not responsible for assuring procedures are in place for inmates to receive medical care." *Williams v. Limestone Cnty., Ala.*, 198 Fed. App'x 893, 895 n.2 (11th Cir. 2006).[7]

Walker County argues that because its contract with PFHS required PFHS to provide "basic and adequate" medical care, the CFS is proof that the County provided medical care and did not violate Mr. Smothers's constitutional rights. (Doc. # 77 at 2). Specifically, Walker County points to the contract requirement that PFHS provide "basic and adequate" medical care for inmates seven days a week, and that PFHS provide "a properly licensed and credentialed medical team including a physician, dentist, or [an] advanced practice nurse to come to the jail for formal clinic one day a week or more as indicated according to acuity." (*Id.*). Further, Walker County argues that this contract "required that a medical professional be on call seven days a week and twenty-four hours per day." (*Id.*). Walker County further asserts that "[t]he County expected that [PFHS] would meet the terms of contract." (*Id.*). Finally, Walker County contends that the County met its duty to fund medical care because it allocated 60% of its budget to the Sheriff's Office, and of that 60%, 8% (or $472,506.92) was spent on medical care for inmates. (*Id.*).

Plaintiff counters that Sheriff Smith put Walker County on notice that PFHS was not complying with the terms of the 2019 CFS and that "[d]espite the non-compliant condition, the County looked the other way and, in an effort to mitigate cost, renewed the contract with PFHS." (Doc. # 82 at 19). Plaintiff claims that because of Walker County's notice of PFHS's non-

---

[7] Although Alabama Code § 11-14-10 establishes the duty of counties to "maintain a jail," the Alabama Supreme Court clarified that this phrase was "intended to require the county commission to keep a jail and all equipment therein in a state of repair and to preserve it from failure or decline." *Keeton v. Fayette Cnty.*, 558 So.2d 884, 886 (Ala. 1989). The Eleventh Circuit reiterated that the duty in § 11-14-10 to "maintain a jail" "pertains exclusively to the physical plant of the jail." *Turquitt*, 137 F.3d at 1290.

compliance as well as of prior inmate deaths under PFHS care, the County's choice "not to solicit bids or change providers" until two years later constituted a breach of the County's duty to fund inmate medical care. (*Id.* at 19-20). But this argument fails because, again, Walker County has no duty to provide medical care in the jail. Its duty is to fund that care.

First, there is no dispute that Walker County paid the contract price to PFHS to provide medical care as provided under the CFS. Plaintiff's Response to Walker County's Motion for Summary Judgment admits that, according to Sheriff Smith, Walker County never refused to pay a bill for outside medical care for inmates. (Docs. # 70-2 at 59; # 77 at 6; # 82 at 4). Plaintiff also does not dispute that Walker County fully paid PFHS for their provision of inmate medical care. And, as discussed above, there is no genuine dispute that Walker County's explicit policy was memorialized in the CFS with PFHS, and that Walker County did not have a policy of prioritizing money saving over providing necessary inmate medical care.

Second, the thrust of Plaintiff's argument appears to center on three points:

1.     A reasonable juror could find that as of 2019, Walker County was put on notice that PFHS was not complying with certain terms of its CFS. Sheriff Smith told County Commissioner Chairman Jerry Bishop that he was concerned with the low quality of medical care being provided by Childers and PFHS, and specifically the concern that Childers was not following the CFS. (Doc. # 70-2 at 47-49). Sheriff Smith also testified that he generally put Walker County on notice that PFHS was only providing CNAs (nurse assistants) rather than the "two nurses on site" required by the CFS. (*See* Docs. # 70-1 at 27, 34; # 70-2 at 47-49). Additionally, in a 2016 email to Walker County, Childers wrote that a doctor came to the jail monthly even though the CFS at the time required a "medical team" to "come to the jail for formal clinic one (1) *day per week*." (Docs. # 70-6 at 3; # 70-8 at 2) (emphasis added).

18

2.      A reasonable juror could also find that, as of 2019, Walker County was on notice that there were allegations that PFHS provided low quality medical care. One of the issues Sheriff Smith ran on in his 2018 campaign was the low quality of medical care at the Walker County Jail. (Doc. # 70-2 at 46). Further, Walker County Administrator Robbie Dickerson testified that she had become aware that after PFHS's contract began, several inmates had died and that there were complaints that these deaths were due to a lack of medical care. (Doc. # 70-1 at 27).

3.      Finally, a reasonable juror could find that as of 2019, Walker County had chosen not to solicit new bids or cancel the month-to-month contract that it had with PFHS. Additionally, Sheriff Smith testified that Mr. Bishop indicated that because "it was his election cycle . . . we would address the contract and the bid after the election." (Doc. # 70-2 at 57).

These facts indicate that Walker County chose not to solicit new bids for the provision of inmate medical care despite being on notice of PFHS's non-compliance with the CFS and allegations that PFHS provided low quality medical care. But, this is not enough to show that Walker County had the requisite degree of culpability under Alabama law. Alabama law imposes on Walker County only the duty to fund "[n]ecessary medicine and medical attention to those prisoners who are sick or injured . . . ." Ala. Code 1975 § 14-6-19. The cases have interpreted this as limiting counties to the duty to fund medical care for inmates. *See Shaw v. Coosa Cnty. Comm'n*, 330 F. Supp. 2d 1285, 1289 (M.D. Ala. 2004) (citing *Gaines v. Choctaw Cnty. Comm'n*, 242 F. Supp. 2d 1153, 1161 (S.D. Ala. 2003)); *Cole v. Walker Cnty.*, 2015 WL 1733810 at *4. Under Alabama law, a county "is not responsible for assuring procedures are in place for inmates to receive medical care." *Williams v. Limestone Cnty., Ala.*, 198 Fed. App'x 893, 895 n.2 (11th Cir. 2006). This limits Walker County's duty as one to *pay for* necessary medical care. It is undisputed that Walker County fulfilled this duty.

Walker County paid PFHS its full contract price to provide "basic and adequate medical care." (Doc. # 70-9 at 3). Walker County never refused to pay for outside medical care when Sheriff Smith began his policy of sending inmates to outside hospitals whenever they were hurt. (Doc. # 70-2 at 59). Finally, the numbers indicate that despite impending bankruptcy in 2017, Walker County did not materially cut the budget for Sheriff Smith or, by extension, for inmate medical care. While Sheriff Smith's budget in 2016-2017 was $5,806,457.56, in 2017-2018 it was only reduced to $5,036,986.78 and in 2018-2019 it was back up to $5,935,889.64. (Doc. # 70-10 at 3). And, in any event, as Mr. Smothers was in the Walker County Jail in 2019, there is no indication that Walker County's possible bankruptcy and budget cuts in other areas in 2017 affected the funding of Mr. Smothers's necessary medical care. In addition, although Walker County could have elected to solicit new bids after being put on notice of PFHS's non-compliance with the CFS and their allegedly low quality of inmate medical care, Plaintiff presented no case law (and the court is unaware of any) to support the conclusion that an Alabama county has a duty to change medical providers once being put on notice of their alleged low quality or non-compliance with portions of a contract. In this § 1983 failure to fund claim, the law asks only one question in relation to a municipality in this context: did it fund "[n]ecessary medicine and medical attention to those prisoners who are sick or injured"? Ala. Code 1975 § 14-6-19. Walker County did so by paying PFHS to provide "adequate" services to inmates and by paying all bills for outside medical care. Any claim that the County is liable for the subpar medical services of the medical provider hired to treat patients is essentially a claim for *respondeat-superior* liability, which is not a viable theory under § 1983.

**V.      Conclusion**

For the reasons discussed above, Walker County's Motion for Summary Judgment (Doc.

# 69) is due to be granted. An order consistent with this memorandum opinion will be entered

contemporaneously.

**DONE** and **ORDERED** this September 17, 2024.

_____

**R. DAVID PROCTOR**

CHIEF U.S. DISTRICT JUDGE